IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

GERARDO COSME and

COSME SERVICES, LLC,

      Plaintiffs

CIVIL ACTION FILE

No.

_____

vs.

JURY TRIAL DEMANDED

MESSER FINANCIAL GROUP INC.,

and WILLIAM LLOYD RICE

      Defendants

<u>COMPLAINT</u>

      Gerardo Cosme ("Cosme") and Cosme Services, LLC ("Services") files this Complaint against Messer Financial Group Inc. ("Messer") and William Lloyd Rice ("Rice") showing the Court as follows:

1.

      Cosme resides at 3915 Hadley Farm Drive, Marietta, GA 30066 and is a citizen of the State of Georgia. Services is the entity Cosme uses in his business, which is selling health insurance and health plans as a licensed Insurance Agent in Georgia. Cosme is Services' registered agent with Services' registered office being 3915 Hadley Farm Drive, Marietta, GA 30066.

2.

Messer is a North Carolina Corporation with its principal office located at 4301 Morris Park Drive, Mint Hill, NC 28227-2253. Its registered agent is William Lloyd "Bill" Rice, 4301 Morris Park Drive; Mint Hill, NC 28227-2253. Rice is the CEO of Messer. Rice resides at 11341 Home Place Lane, Mint Hill NC 28227-8263.

3.

Messer does not appear to be qualified to do business in Georgia by the Secretary of State, but Messer does maintain Agency License 151498 in Georgia issued by the Office of Insurance and Safety Fire Commissioner. Messer regularly does business in Georgia, often by and/or with the active personal involvement of Rice. Messer, and Rice, regularly solicit business in Georgia, and transact business in Georgia. On some internet websites, Messer is actually shown as having an Atlanta office at 2470 Windy Hill Road Suite 300 Marietta GA 30067. Messer and Rice derive substantial revenue from services rendered in Georgia. For all the reasons stated, Messer and Rice are subject to the jurisdiction of this Court pursuant to OCGA 9-10-91.

4.

There is complete diversity of citizenship between the Plaintiff and the Defendants in this action, and the amount in controversy, exclusive of interest and costs, exceeds $75,000, and therefore the Court has jurisdiction over this matter under 28 U.S.C. 1332. In addition, this case involves a federal question, and therefore the Court also has jurisdiction over this case pursuant to 28 U.S.C. 1331.

5.

Venue is proper in this District and Division under substantially all the events complained of herein occurred in this District. Venue is also proper in this District and Division because the conduct complained of herein took place in this District and Division. 28 U.S.C. 1391.

6.

Cosme is a veteran of 20 years in the insurance industry who has lived and worked in Marietta, Georgia for the last 18 years. During his twenty years of practice in the health insurance industry, he has developed a large book of business and he has also recruited other agents to work with him through Services.

7.

Messer works with over 400 independent agents in multiple states. These agents are independent contractors with Messer. Messer and Rice, in the past, according to Cosme's personal knowledge, have recruited agents to join Messer by promising the agents recoverable advances on up to six months in commissions. A copy of an advertisement Messer is currently using to recruit agents, saying agents can get paid before Christmas on a lifetime stream of income, is attached as Exhibit A.

8.

Messer also offers contracted agents technology in the form of a platform to enroll Consumers in Health Insurance plans and Health Plan Participants through "My1Hr" that helps facilitate the enrollment process—to make it faster so that agents can close more sales in the markets they serve.

9.

As a "Field Marketing Organization" (FMO), Messer receives all commissions and per participant payments due from the insurers and insurance companies for the policies and health benefit plans its agents sell.  Messer as an insurance agency and FMO has relationships with various insurers. Messer maintains a "Carrier List" on its website, identifying all of the insurance carriers who will write policies for insureds or will sell health benefit plans to participants through Messer and its agents.

10.

An Agent like Cosme is "appointed" by the actual insurance companies to be its agent to sell its insurance products, at the same time the Agent is also an Agent associated with the agency Messer. Currently, Cosme's "appointment" with the following carriers is "active" in Georgia according to the website of the Georgia Insurance and Safety Fire Commissioner.

American General Life Insurance Company
Americo Financial Life and Annuity Insurance Company
Anthem Insurance Companies, Inc.
Caresource Georgia Co.
Humana Benefit Plan of Illinois, Inc.
Oscar Health Plan of Georgia
Care Improvement Plus South Central Insurance Company
United Healthcare Insurance Company
UnitedHealthcare of Georgia, Inc.

Alliant Health Plans, Inc.
CIGNA Healthcare of Georgia, Inc.
Progressive Mountain Insurance Company
Unique Insurance Company
Ambetter of Peach State Inc.
CIGNA Health and Life Insurance Company
HealthSpring Life and Health Insurance Company, Inc.
Kaiser Permanente Insurance Company
Coventry Health and Life Insurance Company
First Health Life and Health Insurance Company
Aetna Health Inc.
Aetna Health Insurance Company
Aetna Life Insurance Company
Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.
Greater Georgia Life Insurance Company
WellCare Prescription Insurance Company, Inc.
WellCare of Georgia, Inc.
Humana Employers Health Plan of Georgia, Inc.
Humana Insurance Company
Golden Rule Insurance Company

11.

Messer describes itself as the agent's partner when describing its relationship to an agent like Cosme, who has chosen to associate with Messer and use the "My1Hr" enrollment platform. Those agents—Cosme being one-- are allowed to use the "My1Hr" enrollment platform by paying a monthly fee. The benefits of using My1Hr are sufficiently advantageous to an agent such as Cosme so that he has chosen to pay the fee, and has used My1Hr, since November 2014.

12.

Cosme, during his association with Messer, which began in September, 2014, has actively used "My1Hr" to run quick quotes and side by side comparisons of the costs and benefits of different insurance products. He has also used "My1Hr" to run production and client reports during his association with Messer. Even the computer platform Messer allows Cosme to use as a single agent can run these types of reports.

13.

Cosme has never chosen to be an exclusive agent for Messer. For an extended period up to today, because of the issues described below, Cosme has

been weaning his insurance practice away from Messer. However, he remains affiliated with Messer as an agent for Cigna HealthSpring, Humana and Molina Health Plan. Recently, Rice has been trying to open lines of communication with Cosme to try to bring him back into Messer's fold.

14.

In order to hire and train subagents and to employ administrative personnel, Cosme created Services in August 2007. For the last several years, and currently, Services receives the commissions and per plan participant payments earned by Cosme and the other agents employed by Services.

15.

Under the Messer system, which applied to Cosme, Messer receives all commissions due to Services for policies Services has sold through the carriers with whom Cosme is appointed through the Messer Agency. These policies are written through Messer's My1Hr system so that Messer has all the needed client information.

16..

Messer also receives the per participant payouts earned on the business Services generated, from carriers who use that payment method. The commissions and the plan participant payouts Messer receives are subject to an agency split, with Messer as the agency receiving the entire amount of compensation from the carriers, and then being bound to make the proper payout of the commissions to Services, from the funds that the Messer received from the sale of the insurance policies or plans by Services to clients/customers.

17.

Messer and Services have been splitting commissions with Messer acting as the Field Marketing Organization ("FMO") for Services for 6 years. Services has experienced compensation issues in its dealings with Messer for years. For a long period, the specific duration of which is not clearly known to Plaintiffs, Messer has been underpaying Plaintiffs. Cosme personally generates the lion's share of the sales for Services, so the underpayment has affected him personally severely.

18.

Cosme has raised the issue of underpayment to Rice several times over the years. Rice has reacted passive aggressively in most cases, but in one instance decided with no mooring that Cosme should receive a payment of over

$30,000as a goodwill gesture, trying to tamp down Cosme's concerns with that payment. There was no restrictive endorsement on the check or release requested from Cosme. Therefore, this only confirms Rice's knowledge of Messer's having substantially underpaid Cosme.

19.

After doing an internal audit of Services' commission revenues for past years in early January 2020, Cosme confirmed that Services has not been compensated by Messer for insurance policies and health plans they have sold, despite Services being the agent who interacted with and sold the clients. In making a review of policy information on Healthcare.gov., Cosme discovered that particularly Amanda Baggett, an agent in Lakeland Florida, who is also associated with Messer, has been or was being shown as the agent of record on many policies Cosme sold, and on many relationships that Services, and in most cases Cosme personally, acted as the true agent. In these situations Cosme and Services closed the original sale and the later provided ongoing services to the customers/clients--apart from conversations about renewals of coverage with the customers/clients—answering questions about claims, coverage and other issues that arose under the policies/plans. .

20.

According to the designations of agents of records for clients actually appearing on the Healthcare.gov Marketplace website in January, 2020, Cosme and his subagents working at Services had somehow been eliminated as the agent of record for many of their clients, which meant for sure Services was not been compensated by Messer for the sale of the health insurance policies or health plans to all of the members Plaintiffs sold and serviced. On Healthcare.gov, Cosme was not listed as the AOR for many clients he sold. Amanda was.

22.

Whoever is identified as the agent of record for the customers/clients is the agent who receives the commissions on the premium the customers pay on the insurance policies and the agent share of per participant payouts on Health Plans—after the payments go through Messer and Messer divides them.

23.

The agent of record designation controls agent compensation entirely. However, as long as the listed agent of record is still affiliated with Messer, Messer receives the payments and its share does not change. So, in the

situation with Amanda, Messer received the compensation due on Cosme's clients, kept its share, and then paid Amanda or her entity Amerus the agent's share, instead of Cosme or Services.

24.

After discovering Plaintiffs' underpayment problem,  Cosme contacted Ambetter of Peach State Inc., a Georgia insurance company owned by Centene Corporation—because  all the members that Cosme had discovered had been converted away from Services to other agents of record were members who had purchased insurance with  Ambetter  through Services.  Cosme also contacted the Office of Insurance and Safety Fire Commissioner of Georgia, and particularly Commissioner of Insurance John F. King. That office discovered that Amanda had taken certain of the members, for which Cosme should have been the agent of record, and  changed the AOR to herself. During the Commissioner's investigation, Ambetter was contacted by the investigator reviewing the complaint file against Amanda. The sales manager with Ambetter downplayed the issue and reported to the Commissioner that Cosme has been shorted $1368.00 in commissions. Cosme did thereafter receive $1368. However, this amount was less than the commission loss Services has suffered in a single month. The deprivation of commissions that Services suffered by this fraudulent conversion from Cosme or other Services sub agents to Amanda or other agents  has been ongoing for many more months, and involved more customers and clients than those who were discovered by the Commissioner in his office's investigation.

25.

Amanda's written response to the Georgia Insurance Commissioner submitted as a part of the investigation said that she had used Messer's "My1Hr" enrollment platform just as Cosme had,  and that Messer's  system had inexplicably  stamped  Amanda as the agent of record on Healthcare.gov regarding Plaintiffs' clients instead of Cosme.

26.

Plaintiffs thereafter requested full disclosure from Amanda Baggett, Abigail Baggett and Timothy Baggett, plus their two entities named Amerus Financial, particularly as where/how Amanda acquired the names of over 100 consumers who were Cosme's clients. These clients had had their "agent of record" –"AOR"—changed to Amanda Baggett on Healthcare.gov. Each of the clients at issue had Cosme designated as their AOR prior to the change,

because Cosme was the one who had sold the insurance and who was servicing the Clients. As a part of the sign up on My1Hr, Cosme had listed himself (or subagents had listed themselves) as the Agent of Record for the Client. Cosme had contemporaneous  personal knowledge, when he discovered the results of the Change Agent of Record Plot,  that none of these clients had desired a change of Agent of Record, and certainly that more than 100 of his clients did not decide suddenly to leave Cosme as AOR to then change their AOR  to Amanda Baggett, en masse.

31.

When clients have been interviewed by Cosme about the change, each one denied that they authorized the change of AOR from Cosme to Amanda, a stranger to them.

32.

Cosme's clients understandably have expressed alarm and concern about their personal information being compromised and manipulated by a stranger such as Amanda. Some of them wanted to put their concerns on the record. Therefore, many  have given formal statements transcribed by a court reporter to the effect that that they had never interacted with Amanda or any of the Baggetts in any way, and that they did not authorize the change of AOR to Amanda.

33.

Messer and Rice helped Amanda and the rest of the Baggett team access Cosme's client list and assisted Amanda in changing the AORs and diverting the commissions due Cosme to Amanda. The relationship between Messer and Plaintiffs was becoming strained, and therefore Messer and Rice had an incentive to keep the clients in their book of business but assigned to another agent, who Messer perceived was more loyal to Messer.

34.

The evidence suggests very, very strongly that Amanda and the team members within her agency, Amerus Financial Group, knew that the consumers whose Healthcare.gov profile they manipulated were actual

enrollees whose AOR was Cosme. The evidence further suggests Amanda and the Amerus personnel   had a list of actual enrollees they used, for the specific purpose of going on Healthcare.gov and making an unauthorized change of AOR from Cosme to Amanda.  These members whose AOR was changed were never contacted by Amanda or any Amerus team member to assess the needs of these consumers and to make proper recommendations to them. Cosme's clients did not give verbal or written consent to replace Cosme, as their agent of record, with Amanda. Rather, Amanda and Amerus just pirated the customers, using the aforementioned list.

35.

When the change of AOR to Amanda occurred, Messer remained as the agency which would receive the commissions for these clients, but at that time made no issue whatsoever of the mass quantities of changes of AOR by Cosme's clients.  This was because Messer had given Amanda and Amerus the list they used to perform the conversion.

36.

After the AOR switch, Messer did the agency split as to the commissions on the client's policies and plan participant payments as before. But at that point, Messer paid Amanda and/or Amerus the agent's portion of the compensation due instead of Services.

39.

Before the AOR switch, besides Services, only Messer had access to Cosme's client list through the "My1Hr" platform. Neither Amanda nor Amerus had any efficient way to create a list of Services' clients, or access to a completed list. This means Messer had to have been the entity that gave Amanda the list, and based on Cosme's prior experiences with Rice, that Rice himself or someone acting at his directive gave the list to Amanda.

40.

Cosme/ Services had a written contract with Messer, which Rice signed on behalf of Messer.

41.

The  actions of Rice and Messer  in divulging Cosme's list of clients to Amanda was a breach of contract, a conversion, and a fraud,  and proximately caused damages to Services in an amount which will be proven at trial in an

amount to be determined within the enlightened conscience of the jury, but not less than $40,000.

42.

Rice was personally involved in and helped facilitate the AOR switch to Amanda, and likely personally have given Amanda the list she used to make the switch. Cosme was aware, before the conversion of his clients to Amanda as AOR, that Messer had helped other agents in the past pull the same stunt as Amanda pulled on him and was actually soliciting other agents to do the same thing in January 2020. In fact, Bill Rice, the CEO of Messer, and its Registered Agent, had in 2016 specifically proposed to Cosme the same scheme intended to victimize another agent for Cosme's benefit.

43.

The motivation Rice and Messer had for the scheme was to have customers who were assigned to an agent of record with whom they had an unshakeable relationship, like Cosme, assigned to another agent less successful and less likely to terminate its relationship with Messer and take the clients away from Messer. The scheme allowed Messer to keep the clients and their revenue stream with Messer, but to strip the same from a strong agent like Cosme, reducing the size of his book and his position in the marketplace.

44.

Cosme has personal knowledge that Messer bribed the other agents like Amanda in these scenarios by giving them a 25% payout on the clients they pirated.

45.

Messer had previously been an approved agency for health insurance carrier Ambetter. However, Messer had lost its contract with Ambetter in 2016.

46.

Cosme was still appointed with Ambetter at the time Messer approached Amanda with the plan to steal his clients. This was a way for Messer to profit from commissions due entirely to Cosme for its Ambetter clients. By the time the Amanda switch occurred, Cosme has been appointed directly with Ambetter, and Messer was completely out of the picture regarding the relationship with Cosme and Ambetter, receiving no revenue on Cosme's sales of Ambetter.

47.

Rather than be shut out of revenue on Cosme's Ambetter clients, Messer extracted Cosme's clients data from their enrollment platform to divert the commissions due to Cosme.

48.

In 2016, Cosme was still appointed as an agent for Ambetter through Peek Performance, an FMO based out of South Carolina. Rice saw Cosme's continued association with Ambetter as an opportunity for Messer. Therefore, Rice proposed that Cosme convert a large number of Ambetter insureds to Cosme as AOR—clients that Cosme had never met or spoke to about anything, much less insurance.

49.

Rice knew at the time in 2016 that what he was personally suggesting, and also suggesting on behalf of Messer, to Cosme was illegal.  Cosme was shocked at Rice's response to Cosme's protests that Cosme could not do what Rice was suggesting. Rice offered Cosme a 25% payout on the commission stream thus diverted.  In this situation, Messer would keep 75% of those commissions they stole from the other agents

50.

Besides the illegality of the suggestion Rice had made, Cosme resisted further, telling Rice that Cosme  as the agent, and Services as his business entity, did not have sufficient manpower to service the number of clients Rice wanted Cosme to divert in the time period Rice was talking about. Rice was undeterred and pushed Cosme hard to do what Rice was asking. Cosme ultimately declined, and again expressed directly to Rice his concerns that Rice's suggestions were illegal.

51.

After Cosme refused Rice's proposal, Cosme was understandably disheartened even as the months passed by about the overall ethics of Messer. Gradually, Cosme began to suspect that Messer was shorting him on commissions. These concerns about the commissions and the overall ethics of Rice and Messer caused Cosme to slowly disengage from his association with Messer as Services' FMO. Services had a place in the market that allowed it to deal directly with carriers such as Ambetter as their agent without the need of

an FMO. Services by 2019 was receiving the bulk of its commissions directly from the carriers, instead of from Messer, as its FMO.

52.

Nonetheless, Plaintiffs have with Messer as the FMO, they are associated with.

53.

Plaintiffs, according to at least one carrier Plaintiffs deal with, has recently lost over 20% of the customers/clients in Plaintiffs' book of business, although virtually no client in the same recent period has told Plaintiffs they want to terminate their relationship with Plaintiffs to switch to another agent.

54.

Messer's scheme of offering agents a payout on the clients to the agents who were taking the AOR designations from Cosme and Services was motivated by Defendants' desire to retaliate against Plaintiffs because of Plaintiffs' refusal to engage in Defendants' illegal activities, and against Plaintiffs for their growing independence from Messer.

55.

Completely apart from Amanda's diversion of Plaintiffs' clients, the diversion of Cosme's AOR status and the diversion of Services' corresponding commissions due from Messer by the other agents who Messer paid instead of Services has caused Cosme to be underpaid in commissions on a whole other group of clients besides the ones Amanda converted, in an additional amount to be determined within the enlightened conscience of the jury, but not less than $50,000.

56.

Messer used the lists of Cosme clients in its possession to guide these other agents in their client diversion activities, and Messer paid them to do the conversions.

57.

As the FMO for Services and Cosme, the agent, Messer agreed with Plaintiffs to perform the accounting function as to the commissions earned by Plaintiffs through their association with Messer. Messer failed to exercise due care in performing that function, and Messer violated the duty of good faith

and fair dealing implied in every contract, proximately causing damages to Plaintiffs in an amount to be proven at trial, but not less than $90,000.

58.

Messer voluntarily undertook, and indeed required Cosme to allow them to undertake under the parties' agreement, a controlling influence over the amount of commissions that Plaintiffs would receive on Plaintiffs' sales of insurance through the Messer agency, and also undertook that duty voluntarily so as to create a duty for themselves of performing the duty with due diligence.

59.

Messer, the architect of its own business plan, set up a situation where there were mutual accounts between Messer and Plaintiffs, and Messer had Plaintiffs acting on Messer's behalf selling the insurance products. Therefore, under OCGA 23-2-58, Messer owed a fiduciary duty of the utmost good faith to Plaintiffs concerning the insurance sales, the accounting of the commission and per participant revenue generated by the sales, the calculations of the amounts due Services and the proper payment thereof, and all other monetary aspects of the parties' relationship.

60.

Messer breached its duty of the utmost good faith to Plaintiffs by doing crooked accounting, underpaying Plaintiffs, and paying other agent's commissions and per participant payments that belonged to Plaintiffs instead of the agents Messer paid.

61.

Messer, and Rice personally, failed to fulfill their duty of the utmost good faith by directing Amanda and the other agents to pirate Plaintiffs' status as AOR for a very large number of Plaintiffs' clients, then paying the pirating agents the commissions Plaintiffs had earned, through the payouts Amanda and the other agents received from Messer.

62.

Messer failed to fulfill its duty of the utmost good faith to Plaintiffs by allowing other agents and Amanda to have access to lists of Plaintiffs' customers—lists that they could obtain nowhere else except from Messer. As part of its duty of the utmost good faith, Messer had a duty to Plaintiffs to keep

those lists confidential to Messer and to Cosme, and not to disclose lists to competing agents.

63.

Once the January 2020 audit was completed, Cosme retained counsel and approached Messer for monthly commission runs that would show on which clients Cosme was paid commissions each month. Receiving those would have allowed Cosme to quickly isolate the clients on which he had not been paid, and would have allowed him to demand that Messer pay him that compensation which was due to Plaintiffs but unpaid, and bring this matter to a swift and reasonable conclusion.

64.

Messer and Rice refused to answer, despite their fiduciary duty to Plaintiffs, owed as Messer was the manager of the mutual account Messer shared with Plaintiffs. That duty certainly required Defendants to provide to Cosme any information and any commission runs he requested, or any overall compilation of the clients for whom Plaintiffs had received commissions. Instead, Messer said it would only respond to inquiries about specific, individual, particular, clients Cosme identified. Defendants knew that this method of inquiry put unreasonable burdens on Plaintiffs, even to identify particular clients in their huge book of business to inquire about, and also to in effect shut down their new client development efforts to meet the unreasonable demands of Defendants as to the audit.

65.

Messer's and Rice's individually requiring Cosme to pick needles from its haystack of clients, randomly suggesting this was a client Plaintiffs were possibly not paid for, it was in bad faith, and violated the principle of fair dealing, and of course Defendants' duty of the utmost good faith to Plaintiffs. Messer also violated their duty of the utmost good faith to Cosme by refusing to provide copies of the agent of record forms allegedly signed by the clients which Messer had allegedly received from the pirating agents, which supposedly justified Messer's, Amanda and other agent's commissions on Plaintiffs' clients.

66.

Messer at the time Plaintiffs made their requests had knowledge that it had facilitated, participated in, and/or honored such improper changes without the proper documentation—they didn't have the documentation, so they just ignored the Plaintiff's request for it.  Messer in fact knew it had <u>led</u> this illegal bribery and diversion effort.

67

Messer's actions appear to violate both the Gramm-Leach -Bliley Act and the Affordable Care Act and are therefore per se breaches of Messer's duties to Plaintiffs.

68.

Cosme's under compensation problems and legitimate regulatory concerns about guilt by association with Messer, as well as its months as years long breaches of its duty of the utmost good faith to Cosme,  have caused Cosme to suffer severe stress related health problems, including an extremely painful and largely uncontrollable case of shingles in his groin area, as well as anxiety and extreme depression. Services' business has been severely damaged particularly in its ability to grow and recruit new clients at the rates it had been able to achieve previously, because Defendants required that so much of its attention be focused on the past, instead of the present and future.

69.

Because Defendants breached their fiduciary duty to Plaintiffs they are liable to Plaintiffs for all the damages their actions and inactions caused to Plaintiffs.

70.

Messer and Rice took the lead in persuading other agents to pirate Plaintiffs' clients, not just their revenues, but also Cosme's status as AOR for multiple clients he had sold and was servicing. Plaintiff's status as AOR for these clients, was unilaterally and wrongfully changed, at Rice's direction, by Messer and the outlaw agents, for the specific purpose of denying Plaintiffs compensation and for the additional purpose of shrinking artificially Plaintiffs' book of business.  Defendants acted with   a specific intent to harm Services, and personally, and they are therefore liable for punitive damages under OCGA 51-12-5.1 without any cap applying to the amount of punitive damages assessed against each defendant separately, taking their worldly circumstances

into account in determining an amount of punitive damages that will deter them from ever acting in the future with the specific intent to harm another.

71.

Rice, CEO of Messer, actively participated personally in the breaches of fiduciary duty owed to Plaintiffs, and Rice aided and abetted Amanda and the other agents in tortuously interfering with Cosme's business, therefore making him personally liable for all of Plaintiffs' damages.

72.

As CEO, Rice had ultimate responsibility for the accuracy of the accounting Messer performed on the mutual account(s) Messer share with Cosme relating to the commission Messer received on Cosme's clients and the then appropriate contractually required payouts to Cosme. In addition, Rice vouched for Messer's accounting to Cosme and would not allow Cosme to challenge it in a reasonable way, or by means easily available to Messer which if utilized would have completed the accounting quickly.  Rice most recently tried to force Cosme to inquire about the accounting only as to single individual clients whose names Cosme picked out of the air from Plaintiffs' massive book of business. This demand was made in bad faith and was made intentionally to be unduly burdensome on Plaintiffs, to thwart Plaintiffs from receiving the accounting Plaintiffs were entitled to. .

73.

Defendants blocked Plaintiffs' requests for information for the express purpose of allowing Messer to conceal its fraudulent accounting, except as to one person at a time. Defendants acted with the express purpose of concealing information from Cosme and for the express purpose of deceiving Cosme. These acts were gross breaches of Rice's individual fiduciary duty to Plaintiffs. Rice exercised a controlling interest over the accounts and stonewalled Plaintiffs, instead of openly dealing with them in accordance with his fiduciary role.

## COUNT ONE

74.

Messer breached its contract with Plaintiff and the implied duty of good faith and fair dealing imposed by the contract by

a. Failing to acknowledge that Cosme was the AOR on all the clients he sold and received.

b. Encouraging both Amanda and other agents, for a promised payout, to take lists of Cosme's clients, clients for whom Cosme was the AOR, and diverting those clients to themselves, fraudulently changing the AOR designation on Healthcare.gov to those rogue agents.

c. Failing to pay Plaintiffs the commissions due them from the commission Messer received on Plaintiffs clients.

d. Facilitating changes of AOR, robbing Cosme of earned commissions when they were bound to honor the designation of Cosme as the AOR based on his relationships with the Clients.

75.

As a proximate result of Messer's breach, Cosme was damaged in an amount to be proven at trial but not less than $90,000 and Cosme is entitled to a judgement against Messer in the amount to proven at trial.

COUNT TWO

76.

Messer as an entity was acting through Rice, its CEO and others. The employees of Messer under Rice's supervision and Rice himself were personally in a confidential relationship created from law, and also resulting from contracts, under which Messer and Rice had a controlling influence over the interest particularly of Plaintiffs, and particularly as to the commission payouts that Plaintiff's would receive; and also Messer and Rice were in a confidential relationship with Plaintiffs as to the accounting Messer did of the commissions Plaintiffs earned as an agent associated with and writing insurance through Messer, and as to Messer's payment of those earned commissions.

77.

Messer and Rice unilaterally thwarted the plaintiffs' desire to have information to ensure they had been paid all commissions due to them from

Messer and controlled the conduct of Plaintiffs, to Plaintiff's detriment. Messer took retaliatory actions against Plaintiffs when Plaintiffs refused to engage in the illegal conduct Messer and Rice suggested.

78.

The relationships described above placed Messer and Rice in a position where they owed Plaintiff the duty of the utmost good faith under OCGA-23-2-58.

79.

Alternatively, and/or in addition, the relationship between Messer and Plaintiff's is one of mutual confidence, being principal (Messer) and agent (Plaintiff's) which by Statute requires the utmost good faith from Messer under OCGA-23-2-58.

80.

Messer and Rice grossly violated their fiduciary duty of the utmost good faith into Plaintiffs by pressuring to engage in illegal activity and then retaliating against Plaintiffs because Plaintiffs insisted in obeying the law.

81.

Messer and Rice breached the duty of the utmost good faith into Plaintiffs by knowingly and intentionally underpaying Plaintiffs for earned commissions and stonewalling Plaintiffs when they wanted accessible records showing the underpayments.

82.

The breaches of fiduciary duty committed by Messer and Rice proximately caused damages to Plaintiffs in an amount to be proven at trial but not less than $200,000 and Plaintiffs are entitled to a judgement against Messer and Rice in the proven amount.

## COUNT THREE

83.

Under OCGA 23-2-56, 57, when defendants act to or employ agents to deceive or to cheat another by any other unfair way, fraud is consummated. Messer and Rice both engaged in fraud as defined by this statute by:

    a. making false representations in the commission paying process to Plaintiff's
    b. underpaying them without proper documentation
    c. intending to deceive Plaintiffs as to the commissions they earned, and trying to keep Plaintiffs in the dark about their true earnings and
    d. reporting that plaintiffs had earned less in commissions than they had earned.

Again, all these steps were taken with the intent that Plaintiffs would be deceived and would not have sufficient information to challenge the false reporting and underpayments. This put Plaintiffs in a position of reliance on the reports, sure, but acting to prevent Plaintiff's to do anything but accept the false reports and allow Messer and the other agents to continue to steal Plaintiffs' commissions.

84.

Plaintiffs were defrauded until the January 2020 audit, although they had previous suspicions and had exercised due diligence trying to get the account reconciled, which defendants refused to reconcile to conceal their fraud. Plaintiffs were severely damaged in an amount to be proven at trial by Defendants fraud and are entitled to a judgement against Defendant for the amount proven. OCGA 51-6-1.

85.

Because Defendants had a specific intent to harm Plaintiffs as shown by the facts above, Defendants are liable to Plaintiffs for punitive damages pursuant to OCGA 51-12-5-1 without the cap on punitive damages thereunder

applying, so that each defendant is liable to Plaintiff for punitive damages in an amount not less than $1,000,000 to deter each defendant from ever again committing such acts of fraud against any other person.

<u>COUNT FOUR</u>

86.

Messer is an "Enterprise" as defined in 18 U.S.C. 1961 (4) and is a "person" as defined by 18 U.S.C. 1961 (3).

87.

Messer and Rice also knowingly and intentionally formed an association, which we call herein the 'Messer Commission Diversion Enterprise" with the purpose of defrauding Plaintiffs. Messer and Rice is a person employed by or associated with the Messer Commission Diversion and Amanda and other agents associated with Messer are as well.

88.

Messer and the Messer Commission Diversion Enterprise is engaged in, and its activities effect, interstate commerce.

89.

As described more fully herein, Defendants Messer and Rice knowingly and intentionally conducted or participated in, directly and indirectly, in the conduct of Messer and The Messer Commission Diversion Enterprise affairs through their acts of bribery, mail fraud, and wire fraud in their acts of changing AORs on Healthcare.gov and paying agents who did so, with compensation that they were not entitled to and depriving Plaintiffs its commissions.

90.

Defendants each knowingly and intentionally conspired with each other and others to conduct or participate, directly and indirectly, in conduct of the

Enterprises' affairs through the actual attempted collection through a pattern of racketeering activity as described in paragraphs 63-64.

### Predicate Acts- the Racketeering Activity
Wire Fraud- 18 U.S.C. 1343

91.

Defendants committed the predicate act of wire fraud in violation of 18 U.S.C. 1343, by accepting as valid the electronic changes of AOR made by Amanda and the other agents they persuaded to change AOR on Cosme's clients from Cosme to those other agents, and then honoring the fraudulent changes by paying Amanda and these paying electronically these other agents a split on the commissions earned on the policies issued to Cosme's clients.

92.

The object of Defendants' scheme was to obtain money or property, including commissions and also, significantly, customer relationships that Plaintiffs had with their customers in which Plaintiffs had a property right. Defendants engaged in their fraudulent activity specifically because  there was a threat that Plaintiffs would sever their ties with Messer and take their entire book of business from Messer, at the time the "change AOR without client authorization," The enterprise acted to stop that by changing the AOR to other agents, in effect deleting them from Plaintiff's book and creating a chance that the clients would stay with Messer and the new agents, all as a part of the fraudulent scheme of Defendants.

93.

Defendants used interstate wire communications in furtherance of their scheme.

94.

Other instances of false statements made by Defendants through the use of interstate wires as part of the scheme to defraud Plaintiffs are alleged in this Complaint.

95.

Defendants engaged in their fraudulent scheme alleged above with the specific intent to deceive or defraud Plaintiffs.

96.

Defendants knew that their misstatements and omissions to Plaintiffs were false and the whole scheme of Defendant in diverting commissions away from Plaintiffs and to other agents was fraudulent.

97.

Plaintiffs were injured as a proximate and direct result of Defendants' misstatements and omissions and actual fraudulent acts in diverting Plaintiffs' commissions to other agents.

Theft by Deception- OCGA 16-8-3

98.

Defendants committed other predicate acts as a part of their RICO enterprise, multiple acts which constitute theft by deception in violation of OCGA 16-8-3.

99.

The Defendants obtained Plaintiffs' property (not only their money, but also  Plaintiffs' customer relationships in which Plaintiffs had a property interest,  by deceitful means or artful practices with the intention of depriving Plaintiffs of the property, and actually delivering the property to other

agents—both the customer relationships and the commissions generated from such relationships.

## 100.

Specifically, Defendants obtained at least the following property from Plaintiffs: Commissions as shown on Exhibit A. It is anticipated that discovery will reveal a much larger number of customers who were diverted away from Plaintiffs by the Enterprise.

## 101.

Defendants obtained the property by creating multiple  false impressions of an existing fact—which agent was the AOR for certain clients and which agent was therefore entitled to the commissions the clients'  purchases generated-- that they knew to be false at the time they were made and at the time Defendants acted on them,  and then in addition by failing to correct the numerous  false impressions they had generated.

## 102.

Defendants participated actively in and masterminded the plot to steal Plaintiffs' customer relationships.

## 103.

Plaintiffs were injured as a proximate and direct result of Defendants' actions, statements, mis statements and omissions stated above and are therefore entitled to recover damages from Defendants as commanded by the RICO statute.

## **COUNT FIVE**

## 104.

Messer was performing the accounting on mutual accounts with Plaintiffs, and making payments to Plaintiffs based on the actual accounting performed by Messer.

105.

Under OCGA 23-2-96, Plaintiffs are entitled to an equitable accounting of their commission accounts and payment accounts with Messer, for the purpose of determining what commissions Plaintiffs earned, from which clients' purchases they were earned,  whether Messer designated other agent(s) as AOR for Plaintiffs' clients, what amount in commissions were paid to other agents on the revenue from Plaintiffs' clients, and the total amount of commissions Plaintiffs earned but did not receive payment for.

106.

Plaintiffs are entitled to a judgment against Messer in an amount equal to the commissions earned by Plaintiffs, their share of the commission payout to Messer from the carriers on the products purchased by Plaintiffs' clients and customers, which was not paid to Plaintiffs though Plaintiffs earned them, as shown by the accounting under OCGA 23-2-96.

## COUNT SIX

107.

Defendants have caused Plaintiffs unnecessary trouble and expense and have acted in bad faith as to Plaintiffs in connection with the matters described above.

108.

Therefore, Plaintiffs are entitled to a judgment against Defendants for their expenses of litigation, including reasonable attorneys' fees, under OCGA 13-6-11.

## COUNT SEVEN

109.

Because Defendants had a specific intent to harm Plaintiffs as shown by the facts above, Defendants are liable to Plaintiffs for punitive damages pursuant to OCGA 51-12-5-1 without the cap on punitive damages thereunder applying, so that each defendant is liable to Plaintiff for punitive damages in an amount not less than $1,000,000 to deter each defendant from ever again committing such acts of fraud against any other person.

110.

Alternatively, Defendants each acted with such an entire want of care that their actions displayed a conscious indifference to the effect of their actions and/ or each Defendant acted wantonly, and/or fraudulently, so that each Defendant is liable to Plaintiffs for punitive damages up to the cap of $250,000 applicable in such situations under OCGA 51-12-5.1.

WHEREFORE, Plaintiffs respectfully pray:

1. for a judgment against Messer in an amount to be proven at trial but not less than $90,000 for unpaid commissions of which Plaintiffs are currently aware.
2. for a judgment against Messer and Rice for their breaches of fiduciary duty to Plaintiffs which  proximately caused damages to Plaintiffs in an amount to be proven at trial,  but not less than $200,000, including a refund of all the payments Plaintiffs made to Messer for the use of the My1Hr enrollment platform during the duration of Defendants' breaches of fiduciary duty, pursuant to OCGA 10-6-31;
3. for a judgment against Defendants in an amount to be proven at trial for the damages proximately caused to Plaintiffs by Defendants' fraud.
4. For a judgment against Defendants for the damages Plaintiffs are entitled to as victims of the actions of Defendants as a part of their RICO enterprise, as commanded by the RICO statute.
5. For a judgment against Defendants for Plaintiffs' expenses of litigation including reasonable attorneys' fees under OCGA 13-6-11;
6. For a judgment       against each Defendant   for punitive damages pursuant to OCGA 51-12-5.1 without the monetary cap on punitive damages applying, so that each defendant is liable to Plaintiff for punitive damages in an amount not less than $1,000,000 to deter each defendant from ever again committing such acts of fraud against any other person besides Plaintiffs, or alternatively for a judgment in favor of Plaintiffs in the amount of $250,000 for punitive damages under OCGA 51-12-5.1
7. For such other and further relief as the Court deems proper.

This 23rd day of September, 2020.

**DALZIEL LAW FIRM**

*S/ Charles M. Dalziel, Jr.*

Charles M. Dalziel, Jr.

Georgia Bar No. 203730

31 Atlanta Street Suite 200

Marietta GA 30060

404-735-0438

chuck@dalziellawfirm.com

## CERTIFICATE OF COMPLIANCE WITH

## LOCAL RULE 7.1

The undersigned hereby certifies that this filing was prepared using one of the font and point selections approved by this Court in Local Rule 5.1C. Specifically, Times New Roman font was used in 14 point.

This 23rd day of September, 2020.

/s/Charles M. Dalziel, Jr.
Charles M. Dalziel, Jr.
Georgia Bar No. 203730